# Reed *versus* Penrose's Executors.

1. On the trial of an issue on an attachment-execution between the attaching creditor and the garnishee, on the plea of *nulla bona*, the garnishee cannot set off an indebtedness from the debtor to himself. STRONG, J., dissenting.

2. If the funds of a defendant in the hands of the garnishee, are exempt from execution, it is for the defendant to set up, and not for the garnishee to plead this exemption. STRONG, J., dissenting.

3. The funds of an improvement company, consisting of tolls, &c., in the hands of a debtor of the company, are liable to execution-attachment, although they be applicable to the repairs of the work, and the company be insolvent. WOODWARD, J., dissenting.

4. The insolvency that frustrates the ordinary process of the law in favor of creditors, is not mere actual insolvency, or want of ability to pay its debts with all its effects, but some legal form of insolvency by which the property of the debtor is taken into the custody of the law by sequestration, assignment, or otherwise, to be administered for the benefit of all concerned. WOODWARD, J., dissenting.

5. An attachment-execution served, wherever it lies, places the attaching creditor in the same relation to the garnishee as that occupied by the debtor before the attachment was laid.

6. An attachment is an equitable assignment of the thing attached; a substitution of the creditor for the debtor, and to the latter's rights against the garnishee.

7. Wherever the garnishee received the fund from the treasurer of the company, under an agreement that he should pay interest, he became the debtor of the company.

8. An insolvent, as well as a solvent corporation, is subject to attachment. WOODWARD, J., dissenting.

9. The Act of 1853, taking away from the creditors of the company the right of sequestration, is unconstitutional and void.

10. By WOODWARD, J., dissenting. *An insolvent improvement corporation is not subject to attachment.* LOWRIE, C. J., and STRONG, J., *contra.*

11. *The funds of the Erie Canal Company, in the hands of Gen. Reed, the treasurer's banker, who paid interest thereon, were not subject to be attached, being in the company's treasury, and not deposits outside.* LOWRIE, C. J., and STRONG, J., *contra.*

ERROR to the District Court of *Philadelphia.*

On the 7th day of October, 1856, judgment was recovered in the Court of Common Pleas of Erie county, by Charles B. Penrose, against the Erie Canal Company, for $13,252.99. A writ of *fieri facias* was issued on the same day, directed to the sheriff of Erie county, which was, on the 30th day of October, 1856, returned "*nulla bona.*" On the 30th of December, 1856, this

* Justices READ and THOMPSON having been counsel in this case in the court below, did not sit during the argument.

[Reed *v.* Penrose's Executors.]

judgment was transferred to the District Court for the city and county of Philadelphia, upon a transcript of the record of said judgment of the Court of Common Pleas of Erie county. On the 30th day of December, 1856, an attachment-execution was sued out of the said District Court, upon the said judgment, attaching the money of the said company in the hands of Charles M. Reed, the garnishee. It appeared, from the evidence in the case, that the said Charles M. Reed was, at the time of the service of the said attachment, president of the said company. That on the 2d of May, 1853, the treasurer of said company made an arrangement with said Charles M. Reed, to deposit with him the funds of said company for safe keeping. The arrangement was, that an interest account was to be kept by the treasurer with said Charles M. Reed, and at the end of each year the balance of interest was to be charged upon the account of the said Charles M. Reed, in favor of the company. The money so deposited was subject to the draft of the treasurer. At the time of the service of the attachment, Charles M. Reed had in his hands, under the said arrangement with said treasurer, the sum of $93,705.04 of the said company's money, deposited in the manner before mentioned.

At the time of the service of the attachment, Charles M. Reed, the garnishee, was the holder of over-due bonds of the company, to an amount much greater than the amount of money in his hands, which evidences of indebtedness he continued to hold, and claimed to use as a set-off, to prevent a recovery against him by the plaintiff in this case. The money so deposited was received from tolls and water-rents, and was the only means of keeping the company's canal in repair. The Erie Canal Company was not of sufficient pecuniary ability to pay its debts; its canal was of public utility, and its entire income and means were not sufficient to keep said canal in repair, and to pay more than from two to four per cent. on the interest of the indebtedness of the company. On the 29th December, 1856, and before the service of the said attachment, the board of directors of said company, appropriated all the money belonging to said company, not previously appropriated, to the ordinary expenses of maintaining and keeping said canal in repair, and the *pro rata* payment of interest on its debts.

On the 9th of April, 1850, the General Assembly of this Commonwealth passed an act, entitled "An Act to limit and regulate sequestrations in the case of the Erie Canal Company." Pamphlet Laws, 437. This act was accepted by the stockholders of the company, in conformity with the provisions of the 6th section thereof, on the 3d day of May, 1850.

On the trial, the garnishee requested the court to charge the jury,

[Reed *v.* .Penrose's Executors.]

1. " That if they believed, from the evidence, that the Erie Canal Company was indebted to Charles M. Reed, the garnishee, by bond or otherwise, on the 30th day of December, A. D. 1856, the date of the service of the attachment, and continued so indebted up to the present time, in a larger sum than he held of the money of the said canal company, the plaintiff could not recover against him as garnishee.

2. " That if they believed, from the evidence, that David McAllaster, Esq., treasurer of the Erie Canal Company, deposited the money of said company, received for toll and water-rents, with Charles M. Reed, the garnishee, for safe keeping, and those moneys were the only means of keeping the company's canal in repair, and the arrangement between the treasurer and Mr. Reed was an individual matter, with which the Erie Canal Company had nothing to do, the plaintiff could not recover against the garnishee.

3. " That if they found, from the evidence, that the Erie Canal Company was an insolvent corporation, and that its canal was of public utility, that its entire income and means were not sufficient to keep said canal in repair, and to pay more than from two to four per cent. per annum on the interest of the indebtedness of said company, such funds were not subject to an execution-attachment in the hands of any person whatever.

4. " That the funds or money of a corporation are not subject to an attachment under the provisions of the Act of the 16th of June, 1836, in the hands of its treasurer, toll collectors, or any of its officers, agents, or employees, in the course of the administration of the business of the object of its creation, therefore, if the jury found that the money in the hands of C. M. Reed, the garnishee, at the time of the service of the attachment and since, was deposited with him by the treasurer, or others authorized by the treasurer, for safe keeping, and was at all times subject to the check or draft of the treasurer, such money was, in contemplation of law, in the treasury, and not subject to attachment.

5. "That if they believed from the evidence, that the Erie Canal Company was insolvent; that its entire means were derived from tolls and water-rents; that the funds so derived, were not the subject of attachment-execution, in the hands of any person whatsoever, the creditors' remedy was by sequestration.

6. " That if they found, that the board of directors of the Erie Canal Company, on the 29th day of December, 1856, and before the service of the attachment on C. M. Reed, the garnishee, appropriated all the money belonging to said company, (not previously appropriated,) to the ordinary expenses of maintaining and keeping said canal in repair, and for the payment

[Reed *v.* Penrose's Executors.]

of interest of its debts, the said money was not subject to attachment in the hands of any person.

7. "That under the provisions of the Act of Assembly, entitled ʻAn act to limit and regulate sequestrations, in the case of the Erie Canal Company,' approved the 9th day of April, 1850, duly accepted the 3d day of May, 1850, at a general meeting of the stockholders of the said company, according to the provisions of the said last mentioned Act of Assembly, no such attachment, as that issued in the present case, would lie."

The court refused to so charge the jury, and directed them to find a verdict for the said plaintiff, for the sum of $13,252.99, and reserved the points of law, upon which the said counsel for said garnishee, had requested that the said jury should be charged, for the opinion of the court in banc.

The jury rendered a verdict for plaintiff, and on the 14th day of May, 1858, the counsel for the garnishee, moved the court for a rule for a new trial, for the reason that they had misdirected the jury, in answering defendants' points in the negative.

Upon the hearing of the rule, the court, SHARSWOOD, STROUD, and HARE, J. J., refused to grant a new trial, and decided the following points:

1. When the treasurer of a corporation, deposits the funds with a banker, who pays interest for its use, he is the debtor of the corporation, and not of the treasurer.

2. The money of a corporation, in the safekeeping of its cashier, treasurer, or other officer, is not liable to attachment.

3. Money of a corporation, in the hands of the treasurer's banker, who pays interest for its use, is subject to be attached.

4. The funds of an insolvent, as well as a solvent corporation, are liable to be attached.

5. A creditor of a corporation, who, as banker of the treasurer, receives the funds under an agreement to pay the same on the treasurer's checks, cannot set off the indebtedness due him, to defeat another creditor who has attached such money in his hands.

6. An attachment places a judgment-creditor in the shoes of his debtor, with all his rights and privileges, just as he stood at the date of the attachment.

Opinion of the District Court on the motion for a new trial.

"PER CURIAM.—This is an attachment-execution, issued on a judgment against the Erie Canal Company, and served on Charles M. Reed. From the answers of the garnishee, and the evidence —all documentary—produced on the trial, it appears that David McAllaster, the treasurer of the company of defendants, keeps an account with Mr. Reed, depositing his money with him, and the collectors of tolls also paying their money to Mr. Reed, to

[Reed *v*. Penrose's Executors.]

the credit of the account of the treasurer. The Erie Canal Company is insolvent, unable to pay the principal, or even interest, of its bonds which have matured. The most it has been able to do, after providing for current expenses and necessary repairs, has been to pay three per cent. to its bondholders on account of interest. Mr. Reed is the president of the company; the largest stockholder, and holder of its bonds matured and unpaid, to the amount of $100,000, and upwards. The plaintiff's judgment is for the principal of bonds of the same character.

"It will be best to consider the points of the cause, as they were presented in the able argument of the gentleman from Erie, who appeared on behalf of the garnishee. It exhausted all that could be said on the subject.

"It was contended, in the first place, that Gen. Reed was the debtor of David McAllaster, not of the Erie Canal Company. But is this so? If sued by the company, must not a recovery be had against the garnishee; could he set off a debt due by McAllaster; if McAllaster were superseded and a new treasurer appointed, with notice to Gen. Reed, could he any longer honor with safety Mr. McAllaster's checks? It is answer enough to this question, to say, that the money deposited with Mr. Reed is the money of the company, and he knows it. The account is kept in the name of David M'Allaster, treasurer, and his receipts show that he received the money for the uses and purposes of the company, and to be accounted for to them. There is nothing else in this point. It is the ordinary case of a debt due to a corporation.

"The second ground taken, is, that the fund in Gen. Reed's hands, is simply money in the treasury, and not, therefore, liable to an attachment. It may be conceded, that the money of a corporation, in the safe keeping of its cashier, treasurer, or other officers, is not liable to attachment. Money in the cashier's pocket or strong box, is in the pocket or strong box of the corporation. He is but a servant, not a debtor of the corporation. Were he robbed, he could plead the loss, without negligence on his part, in discharge. But suppose Gen. Reed was robbed. Does he say, that he kept the money of the company in a box or bag by itself, distinguished from his own, so that if lost by fire or robbery he would be discharged? He could no more plead such discharge, than a debtor could plead any calamity or loss he had met with, to excuse the payment of his debts. These funds he held as a banker, mixed with his own, not as the servant of the company, or of the treasurer. It will make this point stronger—though strong enough without it—to add, that for more than enough to satisfy the plaintiff's claim, Gen. Reed was under contract to pay interest to the company.

"The third point was that an attachment will not lie against

[Reed v. Penrose's Executors.]

an insolvent corporation, or perhaps, as it was modified, against an insolvent corporation entrusted with the construction and management of some public highway or improvement. But where is the authority for this position to be found? No distinction, so far as attachments are concerned, is made between improvement and other corporations, although in the process of sequestration, such a distinction is made, and although in the process of attachment, distinction is made between municipal and other corporations. The reference in the Act of 1845, about attachments, to the Act of 1836, is too vague to justify us in incorporating the proviso as to sequestration in the process of attachment. The reference is more fit to those sections of the Act of 1836, which regulate attachments; nor do the special acts passed in reference to sequestration against this company, at all reach this process.

"I have thus disposed of all these points but one, which was considered by the counsel under the first head, that Gen. Reed, instead of being the debtor, was in fact the creditor of the defendant, to an amount much larger that all the funds in his hands. The answer is, that there is fairly to be implied from the relation of banker to the company, as well as the tenor of his receipts, that he was not to plead a set-off, but to account for and pay over whatever money thus came to his hands as banker. Such a contract, express or implied, precludes his set-off. *Hennis* v. *Page*, 3 Wh. 275; *Bank of the United States* v. *McAllaster*, 9 Barr, 475. It has been urged, however, that though a contract not to defalcate against the company, may be inferred, there is nothing from which a contract not to avail himself of his set-off against a creditor coming in on the fund, by process *in invitum*, and having no better equity to be paid than himself, can be implied. But how is this distinction to be practically carried out? It is clear that the company could demand the debt of Gen. Reed, for any purpose, and that he could not take defence, as to them, that they meant with the money to pay plaintiff. The attachment places the judgment-creditor in the shoes of his debtor, with all his rights and privileges, just as he stood at the date of the attachment. It is, to all intents and purposes, a statute assignment of the debt by the defendant in the execution to the plaintiff. *In re Baldwin's Estate*, 4 Barr, 248.

"Judgment for plaintiff."

To this judgment defendants excepted, and assigned the same for error.

*B. Gerhard*, *Wm. M. Meredith*, and *James C. Marshall*, Esqs., for plaintiffs in error, contended, 1. That as the fund claimed under the attachment was money received by the Erie

Canal Company for tolls and water-rents of said canal, it is not liable to an attachment in the hands of its treasurer, nor in the hands of Charles M. Reed, who was merely the depository of the treasurer. Money, so deposited, is virtually in the treasury, and not subject to an attachment-execution. *Buckley* v. *Eckert*, 3 Barr, 368; *Crossen* v. *McAllaster*, 2 P. L. J. 199; *Pierson* v. *McCormach*, Ib. 201.

2. That under the Act of June 16, 1836, an attachment-execution cannot at all be sustained against an *insolvent* corporation; and that the Act of 20th March, 1845, does not alter the law as to insolvent corporations. To deny this would be to state that the Act of 1845 was a repeal of the 72d, 73d, 74th, and 75th sections of the Act of 1836, which is not pretended; and any other construction necessarily involves this assertion. *Ridge Turnpike Company* v. *Peddle*, 4 Barr, 490; *Monongahela Company* v. *Ledlie*, 3 P. L. J. 179.

But that act has no application to *insolvent* corporations. Surely the Act of 1845 does not repeal the 72d and 73d sections of the Act of June, 1856, which, together with the 74th and 75th sections, constitute a perfect system of procedure against an *insolvent* corporation, securing not only a *pro rata* distribution of its assets amongst its creditors—which is founded upon equity and justice—but which is still of more importance, the public interest is protected by that system, in the sequestrator first applying enough of the receipts, tolls, &c., to keep the canal in repair, in order that the public interest may not suffer. By that system, the object of the legislature was, in the first place, to protect the public interest from being trampled under foot in a scuffle between creditors; and the second was to produce equality of distribution, as in other cases of insolvency. It would be a wild construction of the Act of 1845, to say it repealed the 72d, 73d, 74th and 75th sections of the Act of 1836, so salutary and equitable in these provisions; but if the Act of 1845 is applied to solvent corporations only, the whole system is preserved.

If an attachment-execution can be sustained against an insolvent corporation, and funds seized and taken in execution that may be absolutely necessary to keep up the improvement, it is an end to all such corporations. No matter how much the public may be interested in the maintenance of the improvement, one creditor, no more meritorious than one hundred others, can close up the improvement, because the court before which the proceeding might be, could not try two or three issues, to ascertain in the first place if the money attached was or was not necessary to keep the corporation in motion, and whether money could be withdrawn from the administration of the company, without injury to the public interest. All this difficulty is

easily avoided by adopting the construction we claim for the different Acts of Assembly—that is, that since the Act of 1845, solvent corporations are subject to the attachment-execution the same as natural persons, but that insolvent corporations are not; that proceedings in the latter case must be by sequestration, under the Act of 1836. And that act declares the test of insolvency to be the return of an execution "unsatisfied in part or in whole," which in this case is completed by the return of *nulla bona;* by that construction the public interest as well as that of the entire creditors of the corporation, is fully protected.

It has been the policy of the legislature, for years past, to secure to the creditors of insolvents a fair *pro rata* distribution of the assets of insolvent debtors, manifested by the abolition of preferences in assignments, by the Act of April 17, 1843, and by the Act of the 16th of April, 1849. To hold that the Act of 1845 authorizes a creditor of an insolvent corporation to seize the funds of such corporation, by execution-attachment, to the utter disregard of public interest, and that of ninety-nine one-hundredths of its creditors, equally as meritorious as the attaching one, would be contrary to the whole course of legislation since 1836; but the construction we claim for the Act of 1845, would fully accord with the whole course of legislation for the last twenty years.

We claim that the tolls and water-rents derived from this canal, so far as they are necessary for its maintenance, are no more the subject of an execution than the canal itself. The law is settled that the canal cannot be taken in execution. *Ammant* v. *The New Alexander and Pittsburgh Turnpike Road,* 13 S. & R. 210; *Hawley* v. *Lumberman's Bank,* 10 Watts, 230; *Fritz* v. *Heller,* 2 W. & S. 400.

3. All the surplus funds of the company, not needed for the maintenance of the canal, have been, in accordance with the cherished general policy of the law, appropriated equally among its creditors before this attachment was sued out, and this appropriation prevented any operation of the attachment.

4. The Act of 9th of April, 1850, is a bar to a proceeding, except under that law after its acceptance by the stockholders of the company. It is true that the act makes no allusion to attachments, but the spirit of the act and the reason which caused its enactment, clearly show that it was the intention of the legislature to forbid any interference with the profits or means of the company, which would destroy its public use, so long as those profits and means were lawfully expended, provided that the stockholders would assume a personal liability for all the debts of the company incurred after its passage. Its provisions were intended as a means of protecting a great public

[Reed *v.* Penrose's Executors.]

work, and in view of its insolvency, of preventing any of its creditors from taking such measures as would destroy its public utility. Any other construction of the act than that which we now contend for, would render it a dead letter.

5. Mr. Reed was himself a creditor of the company, to an amount largely exceeding any funds of the company in his hands, and he has a right to set off this debt as a bar to this attachment. Let it be granted, that in the ordinary operations of the company, he has equitably estopped himself from using this set-off—how can an attaching creditor claim the benefit of this estoppel in order to defeat its effect? Both parties must be estopped, or neither can. The application of this point cannot be tolerated in an enlightened system of modern jurisprudence.

*E. Spencer Miller, Esq.*, for defendant in error.—1. The point that Mr. Reed's relation was to McAllaster individually, and that he was indebted to the latter and not to the company, appears to be abandoned. The answer of the court below to this view is conclusive. Mr. Reed's receipts were to McAllaster as treasurer; the account of the latter with Mr. Reed was as treasurer. Mr. Reed knew, therefore, that the money was that of the company, and not of Mr. McAllaster individually.

The company could have sued Mr. Reed directly for this money, and recovered it.

If Mr. McAllaster had died, Mr. Reed could not have refused to pay it to his successor, nor have demanded the receipt of an executor or administrator of Mr. McAllaster. His own receipts would have estopped him.

All the receipts state that they are funds of the company, which he is receiving; and that of January 1, 1856, states an actual appropriation to its purposes of the very sum in Mr. Reed's hands.

But even if the relations between Messrs. Reed and McAllaster had been, so far as Mr. Reed was aware, purely personal, and the latter did not know the company, still, upon its being made to appear that the funds which he was receiving were in fact those of the company, he would have been liable to be sued by it, and therefore its debtor. *Frazer* v. *The Erie Bank*, 8 W. & S. 19.

2. The idea that Mr. Reed, being the depository of the treasurer, was in law himself the treasurer, and that therefore this attachment must be considered as laid in Mr. McAllaster's hands, is met with as much ease as the first point, with which, however, it is rather inconsistent.

Mr. Reed used this money as his own, paying interest for it,

[Reed *v*. Penrose's Executors.]

which would have been a breach of trust, if he had held it as treasurer.

No distinction can be drawn between his position and that of any bank of deposit. In the hands of such banks, as debtors of their depositors, attachments are constantly laid and sustained; and the Act of Assembly itself expressly provides for the attachment of "*deposits* of money *belonging* or due to the defendant." Act of 16th June, 1836, §§ 32, 38; Act of 20th March, 1845, § 4.

The argument of the court below is unanswerable. If Mr. Reed had been robbed, or had lost some of the money, after giving his receipt, would he have had the same escape, on the ground of absence of negligence, that the real treasurer might have had? As well might an ordinary bank of deposit make such a defence against its depositor. As well might any debtor plead as a discharge from his debt, that after the loan to him, he had lost it.

The money was mingled by Mr. Reed with his own, and used. The identical money of the company could scarcely ever have been in his hands. He honored its drafts from what money he could get from any source. So clearly was it a loan to him, which allowed its entire change and free appropriation for his own benefit, that he paid interest for its use, thus making it a simple indebtedness.

Suppose Mr. Reed had been a defaulter, could Mr. McAllaster's bondsmen have been made liable? Could Mr. Reed have been charged with embezzlement or breach of trust? If he could not, he was not treasurer, or vice-treasurer of the company, but its debtor for loans at interest.

The law makes all the property of such a corporation subject to levy and attachment, except its franchise, the necessary incidents or accessions of the franchise, such as its easements, rights of way, and the structures or improvements thereon, to enable the public to enjoy them, and the future earnings or income therefrom. Its personal property, including even coin, and its real property not essentially incident or necessary to the franchise, may be taken like those of any other debtor.

3. It is contended further, that an attachment-execution will not lie against an insolvent corporation.

The cases of *Monongahela Company* v. *Ledlie*, 3 P. L. J. 197, and *Turnpike* v. *Peddle*, 4 Barr, 490, upon which this argument is based, arose prior to the Act of 1845; but before the decision was given, the act of that year was passed, and Judge Gibson speaks of it as allowing what the Act of 1836 did not allow, "an attachment-execution in defiance of the principle of *pro rata* distribution."

4. We now come to the claim, on the part of Mr. Reed, to set

off against this fund in his hands what the company owes to him on its bonds, in order to defeat our attachment.

We might safely leave this point, also, on the reasoning of the court below. The cases of *Hennis* v. *Page*, 3 Wh. 275, and *Bank of the United States* v. *McAllaster*, 9 B. 475, fully settle that a bank, and of course, therefore, an individual who receives money on deposit, cannot, against an express or implied agreement,—a trust that it shall be ready to answer the drafts of the depositor,—claim to hold it or apply it for his own debt. Mr. Reed, in his answer, says, in regard to the money in his hands, that it " was subject to be paid on call, and was always so paid." In fact, as his receipts show, he received much of it with the knowledge that it had been prospectively appropriated by the company to repairs. He, himself, as director, had appropriated it. The fact, too, that he was president of the company, makes our view stronger. What would have been thought of Mr. Reed, if he had received all the funds of the company of which he was president, from the treasurer, on deposit, and had then claimed to hold them on account of his bonds? He held the company's bonds when he invited the deposits, and to have seized those deposits when they were received, to pay the bonds, would have been a fraud.

At the time our attachment was laid, the rights and positions of all parties were fixed. An attachment " is, to all intents and purposes, a statute assignment of the debt by the defendant in the execution to the plaintiff." *In re Baldwin's Estate*, 4 B. 248. At that time, the company had a full right to demand of Mr. Reed the money in his hands. This right became ours by our writ. Mr. Reed could, under the cases already cited, have made no such defence at that time against the company; and after the laying of our attachment, they had no right to affect the relations of the parties by altering the contract of deposit, and withdrawing the restraint upon set-off for the purpose of defeating us. The equity of the company against a set-off was assigned by the attachment, as well as the debt.

But to show that no offset has been made or contemplated at any time, Mr. Reed has paid out more than the amount of our claim since our attachment was laid; and he has since been receiving interest on the full amount of his bonds. In the resolution of January 1, 1858, there is not a pretence of an offset made or contemplated.

We argue, therefore, that in this case, no offset was possible, and that none was in fact either made or contemplated.

*Hon. John M. Read*, while at the bar, having been concerned in this case for defendant in error, in his brief used in argument,

[Reed *v.* Penrose's Executors.]

contended as follows: The garnishee interposes three defences:

1. This castrated Act of 9th April, 1850. The answer to which is, that it does not touch attachment-executions, and that no court, even if it held it to be constitutional, would extend its provisions one hair's breadth beyond its literal words.

2. That he is a debtor, not of the company, but of its treasurer. The answer to this is, that it is the company's money, passed into his hands with a full knowledge of all the facts, and covered with a trust; and that he is the debtor for these trust-moneys to the corporation of which he is the president.

3. That being a creditor of the corporation, he is entitled to set off the debt due against this deposit of trust funds. The answer to this is, that he stands in the shoes of the treasurer, and if the treasurer could not set off these debts the garnishee cannot. If it were otherwise, then the treasurer could pay him his whole debt, either by direct payment or by collusion, allowing the trust-moneys to come into his possession. This is contradicted by our sense of common honesty, and by all the authorities. *Hennis* v. *Page*, 3 Wharton, 275; *Louden* v. *Tiffany*, 5 Watts & Sergeant, 367; *Bank United States* v. *McAllaster*, 9 Barr, 475; *Turnpike Company* v. *Watson*, 1 Rawle, 330.

It is perfectly clear that the garnishee could set up no such defence against the company. *Petrie* v. *Clark*, 11 S. & R. 377. *Goepp's Appeal*, 3 Harris, 428; *Thompson's Appeal*, 10 Id. 16; *Garrard* v. *Pittsburgh and Connelsville Railroad Company*, 5 Casey, 154; and *Pittsburgh and Connelsville Railroad Company* v. *Barker*, Ib. 160; Hill on Trustees, 91, n., 164, 165, n., 522.

If such be the case, then, as to the moneys in his hands at the time of the service of the attachment, or since received by him, the attaching creditor stands in the place of the company, and as there was no defence against them, there is no defence against the plaintiff here. But any defence which the garnishee seeks to interpose against his liability, must be such as would avail him in an action by the defendant against him. Drake on Attachments, 2d ed., 1858, §§ 682, 686.

The resolutions of the board of directors of the company, at their meeting of 1st January, 1858, at which the garnishee was present, in his character of president, show that this defence is unreal, and not believed in, either by the company or by its depositary, and that if he or they can, by any means whatever, free the corporation from this attachment, the very money he claims to take by set-off, is considered as disposable funds of the company, to pay a dividend of interest to the holders of their bonds and certificates of indebtedness.

They call it the money of the company, and will pay a divi-

dend of such an amount as the funds in the treasury, that is, in the hands of the treasurer and of the garnishee, will permit.

In *Furness* v. *Caterham Railway Company*, decided by the Master of the Roll, on 22d July, 1858; 27 Law Journal Reports, (Chanc.) 771, it appears that the plaintiff, in a judgment in the Court of Exchequer, issued a writ of *fi. fa.* against the goods and chattels of the company, but realized 30*l.* 7*s.* 6*d.* only. He then obtained an attachment under the judgment against a cash balance standing to the credit of the company as their bankers, and realized a further sum of 82*l.* 17*s.* 6*d.*, leaving 3821*l.* 1*s.* 6*d.*, with interest, due to the plaintiff; and he then applied to the Court of Chancery, and was appointed receiver of the railway tolls without salary and without security.

There are ample funds to pay this debt to the widow and executrix of her deceased husband.

The case was argued at Philadelphia, during the winter of 1858-9; and in May following, the court affirmed the judgment of the District Court, but filed no opinion. Subsequently, plaintiffs in error moved the court for a re-argument, when a rule to show cause was granted, and the questions arising in the case were fully re-argued; after which, each of the justices who heard the argument, delivered an opinion.

Opinion by
LOWRIE, C. J.—When we directed the affirmance of the judgment in this case, we were entirely clear on most of the points discussed on the argument, and they seemed to us so simple, that we did not deem it necessary to add anything to the opinion of the court below, relative to them. On two points we had some hesitation, because two of our brethren (Justices THOMPSON and READ,) having been of counsel in the cause, did not sit at the argument, and only two of the remaining three of us were in favor of affirming them. Hence, we did not think that any reasons that we could assign for our judgment, ought to be regarded as of any public importance, and we assigned none.

It was, perhaps, quite natural, under these circumstances, that we were urged to grant a re-hearing. We directed the motion for a re-hearing, to be entered, and that its determination should depend on the two questions already alluded to, and which were stated in the order, and that in the meantime the record should be retained.

On the argument for the motion, these questions were presented in a somewhat different light from that in which they were presented on the principal argument. Then, no reference was made to the pleadings, and the defendant's plea was not printed with the record, and the questions were argued as if they were raised by the issue. Now our attention is directed to

the fact, that the only issue is on the garnishee's plea of *nulla bona*, and it is insisted that the principles which remain in doubt are not raised by that issue.

We think that this position is well taken; and if it had been insisted on at first, we should have had no difficulty.   The plea of *nulla bona* is essentially the plea of the garnishee as garnishee, that he has no effects of the defendants, the Erie Canal Company, in his hands.   This was stated, on the argument, to be the only plea, and it is so stated in one of the paper-books of the plaintiff in error.   This plea was manifestly untrue, and was found by the jury to be so; and therefore the judgment in favor of the plaintiff below, was inevitable.   If the garnishee had any title to take defence against the attachment as a creditor of the defendant, he ought to have pleaded his defence as a creditor, and put the issue on that, and not on the plea of *nulla bona*, which is the plea of the garnishee, and not of a creditor.

And surely he had no right, as garnishee, to take any defence that belonged peculiarly to the canal company.   He had their funds in his hands, which the creditors were attempting to reach. As garnishee, he had no right to set up any defence for the company.   If their funds were exempt from execution, it was for them, and not for him, to plead this exemption.   They might appropriate this money to the plaintiff's debt, or allow it to be so appropriated, and the garnishee, as such, had no authority to intermeddle.

The company are a party to the suit, and might have appeared and pleaded any proper defence, but they did not.   And no creditor appears as such, to plead that the fund is not attachable. We have no defence on the record, but the untrue one of the garnishee, and all other persons have allowed their rights to depend on that.

Suppose the garnishee had succeeded on his plea of *nulla bona*.   According to the plain rules of legal pleading, he would have thereby established the legal conclusion, as against the plaintiff and the canal company, that he had no funds of the company in his hands; though, by his own admission, he had nearly $100,000.   Then he might legally keep this amount, without having paid a dollar of it.   Possibly, equity might have found some mode of averting this result.

It appears, therefore, that the liability of the funds in the garnishee's hands, to this execution-attachment, is not raised by the issue.   The canal company puts in no plea to raise it; no creditor of the company does so; and the garnishee does not, and had no right, as such, to do so.   But it was raised on the argument, and twice fully discussed; and it might have been raised in the case, and we feel that we ought to express the view we have of it.

Is the fund exempt from execution, because it consists of tolls collected on the canal? No; for, ordinarily, this is the only income that a canal company can have; and to exempt this, would put them beyond all compulsory process. Is it so, because it is the duty of the company to apply the tolls to keep up their works? No; for it is likewise their duty to pay their debts. Is it so, because the company had resolved to apply $70,000 for repairs? As well might it be said that a man's intention or resolution to buy a new suit of clothes with certain money, exempts it from attachment. Is it so, because the company is insolvent, in the sense that their income is sufficient only for the repairs of the works and for the payment of two to four per cent. per annum of their debts? No; if they were totally insolvent, it is not they, but their creditors, who have a right to claim that no creditor shall gain a preference over another by judicial process; and creditors cannot do so except by first founding a title to the property for the benefit of all. No private corporation, any more than an individual, can keep its creditors at bay, on any general rule of law, so long as it has its own property under its own control, and this corporation has no special privilege that avails it for this purpose. The insolvency that frustrates the ordinary processes of the law in favor of creditors, is not mere actual insolvency or inability to pay its debts, with all its effects, but some legal form of insolvency by which the property of the debtor is taken into the custody of the law by sequestration, assignment or otherwise, to be administered for the benefit of all concerned, and is thus put under an extraordinary process, which the creditors may pursue, according to its nature. Even when the State claims to enforce the application of the tolls to the repairs of the works, it must do so by process in court, and must submit to the rule that the process first attaching shall be first satisfied. It would be strange, indeed, to say that the company may pay all this money to Mr. Reed, on his bonds, or to any other creditor at their pleasure, (as certainly they might if not for this attachment,) and yet that other creditors have no right to attach it; that they may have property which they may dispose of at their pleasure, (subject to the law of fraudulent conveyances,) and yet there is no process by which their creditors can reach it.

Does an execution-attachment, in the ordinary form, lie against a private corporation? The Act of 20th April, 1845, is express in the affirmative for the general principle; but it adds, that the process "*may* be proceeded in to final judgment and execution, in the same manner, and under the same rules and regulations, as are directed against corporations by the Act of 16th June, 1836, relating to executions." Taking this ad-

dition, as it stands, it is impossible to put it in practice. The general rule of the act is quite plain, making private corporations subject to *all* execution-attachments, and under ordinary circumstances, the form of the process belonging to the general rule, and prescribed in it, is plain and complete in all its parts.

For ordinary cases, the specific mode, referred to in the added words, is not needed, and they would, if applied to the general rule of the act, frustrate it entirely. This cannot have been intended. But by giving the added words, a specific application to fitting cases, according to the general rules of law, all may stand. It is susceptible of such an application, when the garnishee in an execution-attachment is a corporation, and only then. It was natural for the legislature, in making provision for the attachment of *stocks and deposits*, to think of banks, or other corporations, as the garnishees, and then to provide, that against such garnishees, a judgment in attachment should be enforced, in the same manner as other judgments against such corporations. When individuals are garnishees, this special rule has no application, and then the general rule of the law is to be the guide. We are not called upon, to say anything relative to the Act of 9th April, 1850, concerning sequestrations of this corporation, except that a law regulating a special remedy, does not, by implication, take away a general remedy of another character.

Was the garnishee entitled to set off the bonds held by him against the company, as a defence to the execution-attachment? Under the pleadings, we think not, and, for the present, we limit our opinion as thus expressed. No set-off is pleaded, and in real fact, none was claimed, because the garnishee did not wish to apply the deposits to himself, but only to use his bonds, as a means of protecting the deposits from being seized for any particular creditor, and this may account for the absence of a plea of set-off.

To sustain the issue, on his plea of *nulla bona*, the garnishee showed that he held a very large number of the bonds of the company, amounting to near half a million, but he did not offer to set off any of them, or plead his right or intention so to do. If he had done so, we should undoubtedly have had a replication from the company, for they would hardly have allowed him thus to appropriate all the deposit to his own use, without dispute. Yet that would be the effect of sustaining a plea of set-off, or a defence by way of set-off.

The defence here is, to prevent the plaintiff from getting a preference, but it is set up in a form, that would give an immensely greater preference to the garnishee, if he is to have a judgment on the ground of set-off, for that would enable him to keep the whole deposit. If he should succeed, on the plea of

[Reed *v.* Penrose's Executors.]

*nulla bona,* then the deposit would be satisfied by operation of law, without his paying anything, or giving up any of his bonds.

Motion for re-argument discharged, and record remitted.

Opinion by

STRONG, J.—When this case was first argued, no one of the assignments of error, in the opinion of a majority of this court, was sustained. An affirmance of the judgment of the court below was thus inevitable. We allowed, however, a motion for a re-argument, and on that motion the case has been a second time fully argued. Yet, notwithstanding the second argument, we remain, individually, of the same opinion as when the judgment of affirmance was entered. Our convictions are diverse upon the principal points of the case, and this fact induces me to express my own views unsupported though they be, by the judgment of either of my brethren.

The questions, presented by this record, are substantially but two. The plaintiff in error contends that the fund in his hands is not subject to seizure under the process of attachment-execution, because, first, he is not the debtor, or bailee, of the defendant in the execution; secondly, because even if he be a debtor, or bailee, the fund is tolls of the canal, and therefore not attachable; thirdly, because the defendant in the execution is an insolvent improvement company, and therefore, no attachment can be issued to seize debts due to it, or deposits which it has made.

The second position taken by the plaintiff in error is, that the execution-defendant is a debtor to him to a larger amount than the entire fund in his hands, and that he may defalcate the debt due to him.

I propose to examine each of these questions. It may be premised that the effect of an attachment-execution, served wherever it lies, is to place the attaching creditor in the same relation to the garnishee as that occupied by the debtor before the attachment was laid. *In re Baldwin's Estate,* 4 Barr, 248. The attachment is an equitable assignment of the thing attached; a substitution of the creditor for the debtor to the latter's rights against the garnishee. Whatever rights, therefore, the Erie Canal Company had against Gen. Reed, either as its depositary or debtor, Mrs. Penrose has succeeded to, by virtue of her attachment, on the supposition that the fund is of such a character that it can be attached. Now, I cannot doubt that when Gen. Reed received the fund from the treasurer of the company, under an agreement that he should pay interest, he became the debtor of the company. True, the treasurer might have withdrawn it, but only as the agent of the company. If his agency had ceased, if he had resigned or had been dis-

missed from office, payment to him would have been a mispayment, and would have been no protection against the company. The case shows that Gen. Reed was aware, at the time when the money was deposited with him, that it did not belong to the treasurer.　He knew that the act of deposit was the act of the company, through its agents, and his opening the account with Mr. McAllaster, made the debt none the less due to the company.　In *Frazier* v. *The Erie Bank*, 8 W. & S. 18, it was held, that if an agent procure the note of his principal to be discounted, and deposit the proceeds in bank to his own credit, the principal may maintain an action therefor against the bank· in his own name, notwithstanding the bank, after notice, had paid the money on the check of the agent.　There is nothing then, in the first reason given, why the fund is not liable to attachment in the hands of Gen. Reed.　Nor is there more in the second.　Admitting that "tolls" are not included in the terms "deposits of money (belonging to a defendant) in any bank, or with any person or body, corporate or politic, and debts due to him," (the statutory description of things made liable to attachment,) yet the fund in the garnishee's hands can, in no proper sense, be called tolls.　It lost its character as such when it was deposited with him.　He did not receive it as such, from the transporters on the canal.　He did not treat it as such, when he agreed to pay interest.　It is none the less a deposit, or a debt, because it may have been created by an accumulation of tolls.　If the company had received it from the toll gatherers, and had lent it, taking a bond from the borrower, it would hardly be contended, that in that shape, it was not subject to `attachment, because it remained tolls.　What less is it now? The personal property of most of our improvement companies, is the product of tolls and freight received.　Does it still remain tolls when converted into locomotives or canal boats, or placed upon interest for future use or distribution?　The Act of Assembly looks to the nature of the thing attached, when an attempt is made to seize it, and not to what it was at any time before.

It is hardly necessary to remark, that the resolutions of the board of directors of the canal company, appropriating a part of the money to the rebuilding of certain aqueducts, and the remainder to repairs and the payment of interest, cannot possibly be regarded as having in any sense changed the character of the fund.　Those resolutions were, at most, but a declaration of unexecuted intention, not in themselves an appropriation.　The directors might have revoked them any day, and have diverted the money to any other purpose.　The money was not put beyond the debtor's control.　The interest of the company therein was not divested, nor was any ownership or new right created in another.　The fund still remained a debt due the company,

[*Reed v.* Penrose's Executors.]

or a deposit of money, the precise thing which the Act of Assembly declares to be attachable.

A more important objection is, that which insists that an attachment execution cannot be sustained against an insolvent improvement corporation.

The case shows, that at the time when the creditor's attachment was levied, the Erie Canal Company was insolvent, unable, indeed, to pay the interest upon its entire indebtedness. If the question were to be determined alone, under the provisions of the Act of June 16, 1836, the objection would be unanswerable. That act was the first to give a creditor execution against the *choses in action* of his debtor, but it distinguished the remedies against natural persons from those against corporations. It subjected the latter to sequestration, but it did not authorize an attachment against them. This was first held by Grier, J., in the District Court of Allegheny county, in the case of the *Monongahela Navigation Company* v. *Ledlie*, 3 Penna. Law Jour. 179, and was afterwards ruled by the Supreme Court in *Ridge Turnpike Company* v. *Peddle*, 4 Barr, 490. It is well to note the provisions of the Act of 1836, respecting executions against corporations. In this way, the purpose and meaning of subsequent legislation will be better understood. These provisions were intended for all corporations except municipal, whether solvent or not. It was required that all executions should command the sheriff, or other officer, to levy the sum recovered of the " goods and chattels, lands, and tenements" of the corporation in the manner prescribed in the act. That mode was first by making a demand at the banking house or principal office. If no person could be found on whom demand could be made, or if demand proved fruitless, the officer was next required to seize personal property of the corporation, that is, personal property, as distinct from rights and credits, as will hereafter appear. If the corporation defendant was a banking company, the officer was required to take current coin. Thirdly, if no sufficient personal property could be found, the officer was commanded to levy upon real estate of such corporation, and proceed to sale thereof, as the law provided for the sale of land in other cases, where others than corporations are defendants. If all this proved unavailing, if the execution was returned unsatisfied, in whole or in part, the act next allowed a writ of sequestration to issue, to sequester the goods, chattels, and credits, rents, issues, and profits, tolls, and receipts. In this last case the direction, is that the net proceeds shall be distributed among all the creditors of such corporation, according to the rules established in the case of the insolvency of individuals, reserving, however, to the court which issued the writ, the power to direct a portion of the revenue of any work in the maintenance or repair of which the public

[Reed *v.* Penrose's Executors.]

may be interested, to be expended thereon.　It was by this writ alone, that under the Act of 1836, the debts due to any corporation, or the deposits of money made by it, could be reached in execution.　The corporation was incapable of being forced into insolvency distribution by arrest, as a natural person then could be.　Nor could sequestration be resorted to until a return to an execution furnished record evidence, that there was neither personal nor real property upon which it could be levied.　But when an execution had been so returned, solvent equally with insolvent corporations were liable to sequestration.　No distinction was made.　Even a savings bank, the whole of whose property consisted in moneys loaned, but which was abundantly able to pay all its debts, might be forced into insolvency after a return of an execution unsatisfied, if it had not money on hand to pay the judgment forthwith.　And what was more, the creditor could reach the credits of a corporation either solvent or insolvent, only by the slow process of sequestration, and not even by that, until notice and time had been given to the debtor to remove the credits beyond his reach.　Such was the state of the law when the Act of March 20, 1845, was passed; P. L., 189. The 4th section of this latter act was intended to enlarge the rights of creditors, to give them a remedy against corporations, which they had not before.　The act is remedial, and should be construed so as to remove the mischiefs then existing, and to carry out the purpose of the legislature.　It extends so much of the Act of June 16, 1836, " as provides for the levy and recovery of stock, deposits, and debts due to defendants by process of attachment, and *scire facias* to all cases of judgments to be issued against corporations, (other than municipal corporations.")　This language is general, and is applied to all corporation defendants, with the single exception named.　All others, whether a solvent or insolvent, improvement or not, are within its provisions.　The mischief to be remedied existed in regard to all, and therefore, the remedy provided was extended to all. Indeed the process of attachment-execution was more needful for a creditor of an insolvent, than for one of a solvent corporation.　The greatest difficulty was in obtaining payment from the former.　I see no indication in the act, of any legislative design to distinguish between them, and it seems to me that were we to make a distinction, it would be legislation rather than construction.　The exception of municipal corporations alone, furnishes the strongest implication, if help be needed from an implication, that no other exception was intended.　How then it can be maintained that the Act of 1845, is applicable only to solvent corporations, that it gives the process of attachment-execution against them only, and not against those which are

[Reed *v.* Penrose's Executors.]

insolvent, and that the latter can now only be reached by se-
questration, I cannot understand.

An argument is attempted to be drawn from the part of the
fourth section succeeding that I have quoted. It is that in
which the legislature have said, that from and after the passage
of the act, "all such process, (the attachment and *scire facias*
authorized,) which hereafter may be issued, may be proceeded
in to final judgment and execution, in the same manner, and
under the same rules and regulations as are directed against
corporations, by the provisions of the Act of 16th June, 1836,
relating to executions." It is said, this requires that the
process must be pursued, as process is directed to be pursued
against corporations, and that is, by sequestration. But what
process is to be thus pursued? The act answers, all such pro-
cess of attachment-execution and *scire facias.* That is an ab-
surdity. How can an attachment-execution and *scire facias*
against a garnishee, be conducted as sequestration? And be-
sides, if the Act of 1845. applies only to solvent corporations,
and if the attachment against them must become virtually se-
questration, then of what use is the act? What additional
remedy has it given to the creditor? He had a right under the
Act of 1836, to resort to a writ of sequestration. I cannot
suppose that the legislature intended nothing by the enactment
of 1845, following as it did so soon the decision of Judge Grier,
that a creditor of a corporation was not, under the former act,
entitled to an attachment-execution. What then does this last
provision of the act mean? It must be admitted, that like
much modern legislation, it is obscurely expressed, and exhibits
marks of haste, and absence of careful consideration. Yet I
think it may be understood, and may, without doing violence to
its language, be construed so as to be consistent with the former
part of the section, and so as to effectuate the obvious design of
the legislature in the passage of the act. Bearing in mind that
the purpose was to give to creditors of corporations a remedy
for the collection of debts, which they had not before, and that
a process of attachment, I would read this provision of the Act
of 1845, as follows:—

"And from and after the passage of this act, all such pro-
cess, (attachment and *scire facias,*) which hereafter may be
issued against corporations, may be proceeded in to final judg-
ment and execution, in the same manner, and under the same
rules and regulations as are directed by the provisions of the
Act of 16th June, 1836, relating to executions." Thus read,
the whole act becomes intelligible and consistent with itself.
Nor is such a reading an unwarrantable or unprecedented in-
terference with this language. It is mere transposition. No
word is added, none excinded, none substituted. That such a

transposition makes the act express what the legislature intended, I cannot doubt. That they did not intend to be understood as speaking "of rules and regulations" of attachment process as "directed" by the Act of 1836, "against corporations," is apparent from the fact that there were no such rules. It was attachment against corporations, not rules against them, which they had in view. They gave the process itself, which, before that time, had been applicable only to natural persons, and applied to the conduct of that process, the rules and regulations which the Act of 1836 prescribed for its use against natural persons.

Thus understanding the Act of 1845, and convinced that it authorizes attachment-executions against all corporations, except municipal, whether solvent or not, I do not feel at liberty to consider the argument, so much pressed upon us, resulting from the alleged impolicy of subjecting insolvent improvement companies to the embarrassment, and perhaps destruction, which may result from the use of such process. It must be presumed that the legislature considered that, when they passed the act. At all events, my own views of public policy are not to prevail against a positive statutory enactment.

I do not perceive that the Act of April 9th, 1850, has any applicability to this case. It has no reference to attachments. It neither gives nor prohibits them. I concur, therefore, with my brother Lowrie, and with the learned president of the District Court, in the opinion that the attachment in this case was well laid.

I am unable, however, to convince myself that the garnishee is not entitled to avail himself of the protection of the statutes of defalcations, but unfortunately, in entertaining this opinion, I stand alone. The 22d section of the Act of June 16, 1836, declares that execution may be had of the debts due to a debtor, stock held by him in any body corporate, or deposits made by him with any person or body corporate or politic, "subject, nevertheless, to all lawful claims thereon, of such body corporate or person." The garnishee may make the same defence to a *scire facias*, at the suit of an attaching creditor, which he could have made against a suit brought by the debtor himself. Now, had the Erie Canal Company sued Gen. Reed for the money in his hands, why would not the statute of defalcation have protected him, if he had chosen to use it? I think I have shown that he is their debtor, and nothing more. The fund he has in hand, is money had and received for their use. Certainly, if this is not so, their creditor cannot obtain it by attachment. She proceeds upon the assumption that it is a simple debt, due from the garnishee to the judgment debtor; at the same time, the company is debtor to General Reed in a still

larger amount. He holds their bonds past due,. against a claim upon which they have no defence. If he had sued upon his bonds, can any one doubt that the obligors might have set off his indebtedness to them? And now, when they have sued him, or, which is the same thing in effect, when the attaching creditor has sued in their right, if he cannot use the same defence, it must be because there is something peculiar in his situation— something that renders the statute of defalcations inapplicable to his case. It is not pretended that he obtained possession of the fund by fraud; if he had, equity might, perhaps, deny to him even a statutory advantage obtained by his own *covin.* Yet, even if he had obtained the money tortiously, a suit for it as a debt, would have been a waiver of the *tort,* and the defendant might still have availed himself of a set-off, as was ruled in *Bank* v. *McAllaster,* 9 Barr, 475. This right of defalcation is a legal right, secured to a defendant in all cases when he holds demands against a plaintiff, due in the same right, and due at the time when the suit was commenced against him. I agree that he may, by express contract, preclude himself from pleading a set-off; such a contract, founded on consideration, would bind him. This, I understand to be the principle of *Hennis* v. *Page,* 3. Whart. 275, and I think a defendant may also debar himself from using a set-off, by a contract not expressed. Thus, if he receives money, delivered to him for his application to a. particular use, his receipt may amount to an agreement not to apply it to any other use, and of course not to his own, by pleading a set-off. The case of the *Bank* v. *McAllaster,* goes no further than this. But while I admit that a defendant may bar himself from using a set-off, by contract, either express or implied, I deny that he can be deprived of his legal right to defalcate, by anything less than a contract. In the present case, there is no allegation of any express contract not to plead a set-off; certainly none is proved. The only question is, whether one is to be inferred from the transactions between the debtor and the garnishee. It is hardly necessary to say that it is not to be implied from the intention or expectation of the creditor, at the time when the debt due him was created, nor from the inconvenience to which he may be subjected, if the set-off be allowed. Very rarely does a creditor expect that the debt due him will be paid in any other way than with money. Its being extinguished by defalcation, may subject him to inconvenience and embarrassment not anticipated; but all this does not divest a defendant of his legal right. No doubt the Erie Canal Company had no expectation that Gen. Reed would retain the funds deposited with him, under any claim of set-off. No doubt his having done so would have embarrassed them; but they exacted no agreement from him not to plead it; they relied upon what

was at most an honorary obligation. I see nothing more than an honorary obligation to waive his right of set-off. He was the banker of the company, and received their money in the ordinary course of business, as a banker. But is a banker bound to answer the checks of a depositor, when he holds the depositor's notes or bonds past due? Is any such engagement implied in the transaction of deposit? I think it has never been so decided. The contrary has been, again and again. *Davis* v. *Bausher*, 5 T. R. 492; *Rogerson* v. *Ladbroke*, 1 Bingh. 94; *Bank* v. *Armstrong*, 4 Dev. 524; *Albany Commercial Bank* v. *Hughes*, 17 Wendell, 94. And even more than this, it is settled law, that if the banker does pay on the call of a depositor, he thereby discharges the depositor's accommodation endorser of notes, which the banker holds past due. How can this be, if there be no right to retain the money deposited, if, by receiving as banker, he has precluded himself from pleading a set-off.

Nor is there anything in the receipts which Gen. Reed signed, from which can be inferred an engagement not to defalcate. Most of them are mere acknowledgments, that sums of money, being canal funds, had come to his hands, "to be accounted for when required." Is that anything more than a promise to pay on demand? It is not even as much, for it is fulfilled by giving a credit on the bonds which he held; whereas, a promise to pay on demand, is a promise to pay in money. One of the receipts recites, that the sum received, was the amount appropriated by said company, for the rebuilding of the Elk creek and Walnut creek aqueducts, upon which he was to pay interest, until called for. This is a mere description of the ownership of the fund, and an identification of it. It was not itself an appropriation, nor a receipt by the banker, for a purpose designated, as was the case in the *Bank* v. *McAllaster*. Gen. Reed, as banker, had nothing to do with its appropriation, and assumed no agency for any such purpose. He had no right to apply the money to building the aqueducts. His only engagement was to pay the company. Of course, then, there having been no stipulated use, he was free to use his set-off.

Nor is there anything in the fact, that he was president of the company. That might be important, if we were inquiring for the expectations of the depositors, or seeking for an honorary obligation. But his presidency did not prevent his making any contract with the company, and he did contract as banker. He did not receive the money as president, nor is he sued as president, but as a party to a contract.

In all this case, I have failed to discover any evidence of a contract, express or implied, that the garnishee would not plead the statute of defalcation, and I cannot but think, that a denial

[Reed *v.* Penrose's Executors.]

to him of the right of set-off, is enforcing what is only an hono-
rary obligation in a court of law.   I cannot refuse to a party
a legal right, because it may work harsh results; because it
may disappoint expectations, or may produce disaster to one
whose expectations it may cause to fail.   I repeat, that set-off
is a legal right, and, though it may be waived, no one can be
compelled to waive it, except by the force of his own contract,
and this contract must be positive and unequivocal.   *Louden* v.
*Tiffany,* 5 W. & S. 367.   Nothing less than this, will bar a
debtor against defalcating from his creditor's claim, a debt due
by the creditor to himself.   Of course, I am not speaking of
cases of fraud, nor of those peculiar and technical trusts, cog-
nizable only in a court of equity, in opposition to which, set-off
can never avail.   This is no such case.

Opinion by
WOODWARD, J.—The shape which this case has taken, makes
it proper to state it more fully than is customary.

On the 17th of October, 1856, Mr. Penrose obtained a judg-
ment against the Erie Canal Company, in the Common Pleas of
Erie county, for some $13,000, and issued his *fi. fa.* thereon,
which was returned, 30th of December, 1856, *nulla bona.*   On
the same day, he transferred his judgment, by transcript, to the
District Court of the city of Philadelphia, and issued an attach-
ment-execution thereon, which was served on Mr. Reed, as gar-
nishee.   At the time of the service of this attachment, Mr.
Reed had in his hands, of the company's money, the sum of
$93,705.04.

According to the evidence taken and sent up to us, this sum
was made up entirely of tolls and water-rents, earned by the
canal.

Mr. McAllaster was the treasurer of the company; he received
these tolls and rents, and deposited them with Mr. Reed, as a
banker at Erie, under an arrangement made between them, in
May, 1853, whereby the treasurer was to make deposits with
Reed, who was to pay interest upon them according to an agreed
rate; at the end of the year, the balance of the interest account
was to be charged over against Reed.   Deposits were made,
during the business season of the canal, as fast as the tolls were
received by the treasurer; near the close of the year, the trea-
surer was accustomed to make his report to the Board, of the
amount of money in the treasury, including the interest account;
the superintendent, about the same time, made report of the
condition of the canal, and his estimate of the necessary amount
of money required to be expended through the winter and
spring, before the receipt of tolls the next spring, and there-
upon the board of directors always appropriated the entire

[Reed *v.* Penrose's Executors.]

amount of money in the treasury; first, to meet the necessary repairs and ordinary expenses ·of the canal, and the balance, to pay interest on the bonds and certificates of indebtedness of the company.    The appropriations made by the board, in accordance with this usage of business, on the 29th of December, 1856, the day before Penrose's attachment-execution was served, exceeded the entire amount then in the treasury, by from $10,000 to $15,000, and were, to that extent, an anticipation of the tolls of the next year.    The necessity to rebuild certain aqueducts on the line, and which were indispensable to the navigation, compelled this large appropriation.    Reed was not only the treasurer's banker, but he was president of the company, and its creditor to an amount upward of $500,000, for bonds of the company, of the same nature as those on which Penrose recovered his judgment.

The company was insolvent, and had been for upwards of seven years.    The most it has been able to pay on its debts, since 1850, in any year, was four per cent., and that for but one year.    From two to three per cent. is generally the full extent of its ability to pay.

Upon these uncontradicted facts, two questions arose:

1.  Were the company's moneys in Reed's hands, subject to the process of execution-attachment?    2.  Is the garnishee entitled to set-off the debt due him by the company, against the funds in his hands?

The District Court was of opinion with the plaintiff on both questions, and ruled, that the fund was attachable, and was not liable to the set-off, and so entered judgment against the garnishee, for the amount of the plaintiff's judgment.    On removal of the record into this court, these questions were fully argued by counsel, before three of our number, Judges THOMPSON and READ not sitting, because they had been of counsel in the cause, before they came upon the bench.    The three who sat, found themselves unable to agree on the grounds of a judgment, but no two of them being for reversing the judgment below, it was ordered to be affirmed, without assigning reasons.    Before the record was returned to the District Court, the garnishee's counsel applied for a re-argument, and we directed that motion to be heard, in an argument on the merits of the two questions I have stated.    All the other questions in the case were then set aside.    We heard a full argument again.

The immediate question before us is, shall the case be re-argued?    I reply, certainly not.    After having had the re-argument, it becomes us to decide the case on its merits, and either re-affirm the judgment below, or reverse it.    Nor am I willing to turn these questions out of court on an objection to the pleadings.    Doubtless the garnishee might have pleaded the facts

VOL. II.—32

specially, but under the plea of *nulla bona*, the parties went to trial on the merits in the court below; the court considered and fairly decided these questions, and after we have had them argued before us twice, the last time under our express order, without notice of the pleadings, I do not feel at liberty to say that the questions do not arise under the plea of *nulla bona*. I would not say it in the present posture of the case, if I thought so; but I do not think so. It has been usual to try cases against the garnishee in execution-attachment on their merits, under the plea of *nulla bona*, and I know of no rule of pleading which forbids it, especially when the parties acquiesce. The statute likens this process to foreign attachment, and, in foreign attachment, *nulla bona* is properly the general issue. Sergeant on Attachment, 92; and on page 100, he cites three early cases from 1 and 2 Dallas, which lay down the rule, that if the property attached in the hands of the garnishee is not liable to attachment, it seems the court from which it issued may be applied to to dissolve the attachment, or perhaps, the garnishee may plead it to the *scire facias*, or give it in evidence on the plea of *nulla bona*. Since our attachment-execution came into use, this "perhaps" has resolved itself into a uniform practice; and this case, having been tried in accordance with that practice, ought now to be decided on its merits.

Addressing myself, therefore, to the two questions on the record, I decide that, under the circumstances of the case, the fund in Reed's hands was not liable to attachment-execution; and that virtually disposes of the question of set-off, for he claims the set-off only in case the attachment be sustained. I would reverse the judgment and leave the plaintiff to pursue his remedy by sequestration. To explain and justify the grounds of this opinion, it will be necessary for me to state, somewhat at large, the execution process which the legislature have provided for judgment-creditors in general, and for judgment-creditors of corporations in particular.

Before 1836, goods and chattels, lands and tenements, only could be seized in execution in Pennsylvania, in satisfaction of judgments; stocks held in incorporated companies, if not seizable as goods or chattels, were liable, by virtue of an Act of Assembly of 29th March, 1819. See *Lex v. Potters*, 4 H. 295. But a judgment-debtor might be without lands, goods, or stocks, and yet have plenty of money on deposit, or invested in bonds and mortgages, or other *choses in action*. That such a debtor, entirely able to pay his creditor, should be permitted to defy him, was a just reproach to the remedial power of the law, and accordingly, the legislature, on the suggestion of the codifiers, provided, by the Act of 16th June, 1836, that the defendant's stocks, deposits, and debts due him, whether held and owing by corpo-

rations or persons, should be liable to execution, "*like other goods and chattels, subject, nevertheless, to all lawful claims thereupon of such body corporate or other person.*" Sec. 22. " Like other goods and chattels." What does this mean ? Certainly, not that the mode of seizure was to be the same, for a subsequent section provides that the manner of levying and seizing credits, and *choses in actions* shall be like that allowed in foreign attachment. Possibly it meant that the attachment must be taken before resort should be had to real estate; but, certainly, it meant that the attachment might be taken, in the first instance in which any execution process could go out, with or without a *fi. fa.* If this be the meaning of the statute, it puts to flight the idea that is discernible in some of the adjudged cases, and in some of the arguments before us in this case, that execution-attachment must be preceded by a return of *nulla bona*, and is the remedy against parties only whose insolvency is that far established. It is a remedy against a non-paying debtor, whether solvent or insolvent, of a nature exactly similar to a *fi. fa.*, though it is to be employed after the fashion of foreign attachment.

The other clause quoted from the statute is worthy of notice also—" subject, nevertheless, to all lawful claims," &c.

This means, undoubtedly, that the creditor takes the place of the defendant, and is entitled to receive what the defendant would be entitled to have and enjoy. If the fund is subject to liens, or under equities to others, the creditor must discharge them before he can take the fund. He acquires no rights against third parties, superior to those which the defendant possessed. I shall have occasion hereafter to apply this principle to the facts of this case, and shall endeavor to show that the funds in Reed's hands were subject to " lawful claims" of great importance, that would be wholly defeated if the attachment were sustained.

But I go on, for the present, to observe, that this legislation, whereby rights, and credits, and *choses in action*, were subjected to execution, did not apply to judgments against corporations. This court said so in *Turnpike Company* v. *Peddle*, 4 Barr, 490. It will be well to consider the reason of this. On the same day of the enactment of the provisions already referred to, and as parts of the same statute, the legislature provided a special mode of execution against corporations. The very competent codifiers who drafted the law, made a compact and harmonious system. They first provided for execution against judgment-debtors, who were natural persons ; then for executions against corporations. When they came to deal with corporations, they considered that this class of debtors would be in possession of visible and tangible property, real or personal, sufficient to yield

satisfaction to the ordinary process of *fi. fa.*; or else that they would be insolvent corporations, and as such, fit subjects for proceedings by sequestration. The codifiers and the legislature accordingly provided, in the four articles of the 72d section, (see Purdon, 169,) for the satisfaction of executions against corporations, (other than municipal,) out of their real and personal estates; but if satisfaction could not be obtained from these sources, and the *fi. fa.* should be returned unsatisfied, in whole or in part, then, by sections 73, 74, and 75, sequestration was provided of their "*goods, chattels, and credits, rents, issues and profits, tolls and receipts.*" Here was the distinction, plainly marked out between solvent and insolvent corporations. *Fi. fas.* for the creditors of the one—sequestration for the creditors of the other. And in this manner the equitable distribution of the assets of the insolvent corporations among all their creditors was intended to be secured. But more than this was meant. The corporation might owe certain obligations to the public. If it were an improvement company, it was intrusted with its franchises, that it might maintain, for the public convenience, a highway; and the equitable remedy by sequestration must be so guarded as, whilst satisfying the private creditor, it should not sacrifice public rights.

Chief Justice Tilghman, who had suggested the sequestration, (13 S. & R. 212,) had suggested also its necessary limitation. Speaking of a turnpike road, the learned chief justice said, that in providing the remedy, (sequestration,) " care should be taken that so much of the tolls as is necessary, shall be in the first place applied to the repair of the road, and only the *net profits,* subject to payment of debts." Heedful of this suggestion, the legislature said, in the 74th section of the Act of 1836, "that in the case of any work, in the maintenance or repair of which the public may be interested, and which may from time to time require a portion of the revenue thereof, as aforesaid, to be expended thereon, the court which awards such writ shall make such allowance for such purpose, and otherwise take such order thereon as the public good shall require."

Such was the Act of Assembly which gave execution-attachment. It made corporations an exception to it, took them out of the operation of those sections that related to execution-attachment, and subjected them to a form of execution, peculiar to themselves; a form that would either pay the particular creditor out of their visible property, or place all their resources in the custody of the law, to be administered, first, for the benefit of the public, and next, for all creditors alike. It was on this ground Judge Grier ruled, in *Monongahela Co.* v. *Ledlie,* 9 Penna. Law Journal, 179, that corporations were not subject to execution-attachment under the Act of 1836.

The reason, then, shortly stated, why execution-attachments were not extended to corporations was, that the same statute provided an equivalent remedy, so limited and regulated, as to be more equitable to creditors, and just to the public.

The sequestration reached the *choses in action* of insolvent corporations, just as effectually as the attachment-execution, but it divided them among all the creditors instead of giving them to one.  And yet it is apparent, that this legislation did not reach the case of a solvent corporation, whose wealth was all in credits rather than in visible goods and chattels.  Such a corporation might, indeed, be coerced into payment by fear of the process of sequestration, but the Act of 1836 gave no execution process, except sequestration, that could affect its rights or credits.  To remedy this, and to subject the rights and credits of solvent corporations to the same execution process as the rights and credits of other debtors, the legislature, on the 20th March, 1845, passed an act, which has been the subject of great discussion in this case, and which is responsible for our irreconcilable differences of opinion.  It extends the attachment-execution to corporations, and says, that " all such process may be proceeded in to final judgment and execution in the *same manner, and under the same rules and regulations as are directed against corporations*, by the provisions of the Act of 16th of June, 1836, relating to executions."   The word "may," means "must," here.  The remedy was new, wholly statutory, and if pursued at all, must be pursued as the statute directs.

The plain direction of the statute is, then, that the process of attachment-execution, now, for the first time, made applicable to corporations, shall be proceeded in, in the same manner, and under the same rules and regulations, as are directed against corporations by the Act of 1836.   What that manner, and what those rules and regulations were, we have seen.   We have seen that the Act of 1836, marked a distinction between solvent and insolvent corporations, subjecting the former to ordinary execution process, and the latter to the extraordinary process of sequestration.   The Act of 1845 must be understood as referring to this distinction, and maintaining it.   So construed, it adds the execution-attachment to the other execution process, which lies against solvent corporations; but it makes it sequestration process against the insolvent.   Until a corporation is ascertained to be so far insolvent as is implied from an execution returned unsatisfied, in whole or in part, you may have execution-attachment against its *choses*, as against any other debtor; but the moment that degree of insolvency appears, the only remedy is by sequestration.  Penrose might have taken execution-attachment, in the first instance, and it could have been arrested only by the company's coming in and showing its own insolvency;

but unfortunately for him, he placed on the record the statutory evidence of the company's insolvency, before he took his writ, and therefore he was not entitled to take it at all.

This is construing the Act of 1845 according to its letter, and agreeably to the spirit and policy of the Act of 1836. Counsel insist that the word "corporations" is a mistake, that it should be cut out, and "individuals" inserted in its stead. Another suggestion is, to transpose the word "corporations" to another part of the sentence; the exact effect of which would be the same as to substitute "individuals" for it where it stands.

Neither they nor we have any authority to take such liberties with the statute. It does not say the proceedings shall be the same as against individuals, but it does say they shall be the same as against corporations, under the Act of 1836; and we might as well repeal the statute, as to read it otherwise than it is written. Undoubtedly, it was an ill-considered enactment; and there is, I admit, difficulty in giving any construction which will satisfy its terms, and not disorder the system into which it was rudely thrust. But taking into view its terms, as they stand expressed, the deficiency intended to be supplied, and the policy of all our legislation on the subject, I cannot doubt the soundness of my construction. And when I observe that this construction is resisted, simply by making the statute read differently from what it is written, I do not feel called on to surrender my convictions to such a process of interpretation.

I have now referred to all the legislation, and endeavored to ascertain its meaning, which relates to executions against corporations, and it is manifest that the plaintiff's writ, issued after a return of *nulla bona*, was issued without authority of law. For many purposes, such a return of a *fi. fa.* is evidence of insolvency, and it is made so expressly by the Act of 1836, and therefore, is conclusive against corporations. They are put under the stern necessity of paying their debts, or of going into liquidation.

An all-sufficient reason, then, for denying the plaintiff the benefit of his writ, is, that the several Acts of Assembly, taken together, and construed in *pari materia*, do not authorize such a writ in the circumstances of this case; but by providing a different, more just and equitable remedy, those Acts have, by the strongest possible implication, forbidden it. But I go further.

Whether my construction of the Act of 1845, be sound or not, even if we mutilate it, as suggested, and put in "individuals" for "corporations," still it must be granted, that the *choses* of corporations are to be seized, subject to "all lawful claims thereupon." I say this must be granted, because it is a condition im-

pressed by the Act of 1836, on all *choses* subject to attachment-execution, whether of individuals or corporations.

Now, what were the "lawful claims" on this money, in Reed's hands, on the 30th day of December, 1856?

His counsel insists, and one of our number thinks, he had a right to set off the company's indebtedness to him. I am not prepared to admit this, for the whole transactions between Reed and McAllaster, the treasurer, afford a strong implication that he was not to avail himself of a set-off against the company. I cannot consent that the creditor of a company, and he its president, shall get the corporate funds into his hands, under an agreement to account for interest, and to pay them over on call, and then, instead of paying, set up the company's indebtedness to him. Corporate bonds, bought at a large discount, are an easy form of indebtedness, and if officers of an insolvent company might apply funds to them which they hold in trust for the general purposes of the company, the temptation to fraudulent practices would be irresistibly strong, and the ruin of all money-borrowing companies exceeding swift.

But whilst I do not recognize any right of set-off in Reed, as a "lawful claim" on these funds, I do consider that the public had such a claim. The Erie Canal Company was incorporated to finish and maintain one of the highways of the State. It was for this purpose the people granted them the power of eminent domain, and the right to take tolls. The company had become insolvent; that is, unable to pay its debts. This fact is spread all over the record before us; it is proved in answer to the interrogatories; it is admitted by counsel on both sides, and it was decided by the court below. It was established, moreover, in the way the Act of 1836 prescribed, by an execution returned unsatisfied.

Now, what is the law in Pennsylvania, in respect to such a company? When it has accumulated a sum of tolls and water-rents, not more than sufficient to repair and maintain the canal for the ensuing year, may a creditor who has got judgment on the bonds he holds, rush in by execution-attachment, and sweep those funds into his own pocket? I deny it. With great deference to all who differ from me, I say it would be a scandal to our law, to make such havoc of public rights. Those tolls and water-rents were earned by the franchise granted by the public; they belonged, first of all, in reason and equity, to the maintenance of the canal, which was the consideration of the public grant; they were actually dedicated to that object, by the vote of the directors, before the attachment-execution came; and thus the public had a prior and paramount claim, a very lawful claim, upon these funds, before the attaching creditor acquired any.

What is to become of the canal, if judgment-creditors may

attach all the tolls? The money to keep it up must be earned, and if Mr. Penrose could seize $13,000 of that money, in disregard of the necessities of the canal, and the rights of the public, Mr. Reed might levy his half million of indebtedness, as fast as the tolls accumulated, and so might other creditors. Who does not see that in this manner a great public work would fall into speedy ruin, or exist only as a melancholy monument of judicial mistakes.

Judge Tilghman told the people of Pennsylvania, in 1825, that creditors of insolvent corporations ought to have remedy by sequestration; but that in providing it, the lawful claims of the public should be guarded, and only the net profits be given to the creditor; and the legislature of 1836, as we have seen, enacted it as a principle in the law of executions against corporations, that improvement companies should be left with the means of repair and self-preservation; a principle which the legislature of 1845 did not mean to violate, but to preserve and perpetuate.

When, therefore, I deny the right of this creditor, and of all creditors, to come in upon this insolvent corporation, and take, not the net profits of its business, but the very money that was already actually appropriated to maintain the existence of the canal, I stand not merely on the broad ground of public policy, which were quite enough for any purpose, but on strict legal principles,—on positive provisions of the statute law. I speak the voice of those statutes when I say, a judgment-creditor cannot have attachment-execution of the earnings of an insolvent improvement company, but that they must go first to the maintenance of the work, and next, to all creditors *pro rata*.

The directors were actually administering the Erie Canal Company on these principles; and so long as they did it faithfully, they were answering all the purposes of sequestration. If any creditor wanted the administration to pass into other hands, he had only to apply to the court, for sequestration.

But here comes in another objection, that the company had procured from the legislature of 1850, an Act of Assembly, forbidding sequestration at the suit of a single creditor.

That act did, indeed, take away the only execution process provided against insolvent corporations, but it gave the creditors an equivalent, in the personal liability of the stockholders for the debts of the company.

To say that this was a mere modification, and not annihilation of remedy, and therefore a constitutional law, would be saying a very strong thing; but what can be said in behalf of such a law, in view of the fact that, on the 12th of April, 1853, the legislature repealed so much of the Act of 1850, as made the stockholders liable, in their private capacity, for the debts

of the company? This legislation left this insolvent company in possession of its works, more or less productive, and took away from its creditors the only remedy they had by law. I agree with one of the learned counsel, that such legislation was both oppressive and unconstitutional.

Stay laws have been held constitutional, but it never can be maintained that the legislature may abolish debts, which they do when they deny all remedy for the recovery of them. This Act of 1850, taken in connection with the repealing law of 1853, was in conflict with those provisions of the Federal and State Constitutions, which forbid the impairing of the obligation of contracts, and with the 11th section of the 9th Article of the State Constitution, which secures to every man, remedy, by due course of law, and right and justice, without sale, denial or delay.

If companies under pressure of their debts, and the legislature in its haste and thoughtlessness, will fence out creditors, by such unwarrantable provisions, the courts are under the most solemn obligations to throw down the fence, and to secure to the creditors of each particular corporation, the constitutional rights that belong to corporate creditors in general. Sequestration is the general remedy provided by law, for the creditors of insolvent corporations in Pennsylvania; and though the legislature may modify, or perhaps repeal that law, they cannot, whilst it stands on our statute-books, hedge round a particular company, so that it shall be subject to execution in no form.

Setting aside the Act of 1850, as therefore unconstitutional, in so far as it denies sequestration to the plaintiff, my second reason for denying his right to an attachment-execution is, that it would frustrate the lawful claims of the public upon this corporation; claims which the statute giving this kind of execution, says shall be preserved.

But again, the moneys seized by the plaintiff, were in the treasury of the company. I do not embarrass myself with any inquiry about their ear-mark as tolls, nor whether, if they had been stolen, or burned, or embezzled, the loss would have fallen on Reed, or on McAllaster, or on the company. All these, and similar questions, may be laid out of view, as tending rather to mislead, than to enlighten the judgment on the point now under consideration.

The fact is, that the moneys in Reed's hands, were the treasure of the company, and as such, were subject to corporate control, and had indeed been already appropriated to the repairs of the canal. If the company ever had any money in their treasury, that money was in it, just as the revenues of the government of the United States are in the treasury of the United States, after an Act of Congress, making an appropriation of them, and before draft, though, in point of fact, they may be in

[Commonwealth *v.* Jeandell.]

this sub-treasury or in that; in the custom-house of New York or New Orleans, or in transit between those points.

When our legislature makes appropriation of money in the State treasury, they do not stop to ask whether it was in the strong box at Harrisburg or on deposit in Philadelphia. Either way, it is equally in the treasury, and subject to legislative appropriation. But once appropriated, the money is thenceforth virtually assigned to a specified object, and can be appropriated to no other.

Nor could these moneys of the Erie Canal Company. Kept where the company chose to keep its funds, they had been in due form appropriated to repairs, and, after that, could only be drawn to be applied to that object. They were no more subject to attachment than any other appropriated, but undrawn balances in the company's treasury. Deposits they indeed were, as everything laid down is a deposit; but neither debt nor deposit, within the meaning of the Act of 1836, for they were where the company kept their treasure, and so not out of their treasury.

My reasons, then, for denying to this plaintiff the fruits of the attachment-execution, are:

1. That the company being insolvent, the Acts of Assembly did not authorize this writ to issue.

2. But if it did lawfully issue, it could not be levied on the funds in Reed's hands, to the prejudice of the canal and the public; that the net profits of the company's business alone, were liable to execution, it being an insolvent improvement company.

3. That the funds were not attachable, because they were within the company's treasury, and not deposits outside of it.